SABATTIS SUSUP JOHN & others *vs.* TOMER SABATTIS.

Penobscot. Opinion May 29, 1879.

*Statutes,—construction of. Indians,—tenure of. Parol partition.*
*Title by disseizin. Forcible entry and detainer.*

The collection of the various acts respecting the Indians into R. S., c. 9, and their condensation in the process of revision, do not affect their meaning.

R. S., c. 9, §§ 22 and 23, respecting the assignment of house and garden lots in Oldtown island, are not affected in their construction by §§ 15-18, derived from an act passed years before relating to other property, *diverso intuitu.*

The production of the certificate, provided in § 17, is not essential to prove an assignment of a house lot under § 22; but it may be presumed from undisturbed possession, originating more than forty years since, and improvements made upon the lot before the passage of Stat. 1839, c. 396, with possession of the lot and improvements, continued to the present time in the party, or his descendants or grantees, and those claiming under them.

The approval of the Indian agent is not necessary to the validity of a sale of such house lot to an Indian of the same tribe.

The tenure which Indians have in these lots under Stat. 1839, c. 396, and the subsequent revisions thereof, is a qualified fee, determinable at the pleasure of the legislature; but until the will of the legislature is expressed by legislation, it is capable of being conveyed to an Indian of the same tribe, and of descending to his heirs.

Indians may acquire title to such lots against each other by disseizin and adverse possession, and make partition of their interests in common therein.

While a parol partition of real estate is invalid by the statute of frauds, the exclusive possession in severalty after such partition will bar either of the former co-tenants from asserting any right or interest in the share of the other.

Land necessary for the support and use of the same may pass by the grant of a house, or barn, or a mill, if such be the intention of the parties; when the structure only is named, and no land is granted, *eo nomine*, but only as incident to the building, and an abandonment of the site for the use of the structure will be followed by a failure of title to the site.

Under R. S., c. 94, § 1, forcible entry and detainer may be maintained against a disseizor who has not been long enough in possession to be entitled to improvements.

ON FACTS AGREED.

FORCIBLE ENTRY AND DETAINER, to recover possession of three rooms on the ground floor of the west half of the dwelling house formerly occupied by Sabattis Peol Susup, Fransway Peol Susup and Francis Xavier Susup, and the outbuildings connected with the same in possession of Tomer Sabattis, and the lot of land on

which the buildings stand and appurtenant thereto, all situated on Oldtown Island.

Plea, not guilty.

Five brothers, Peol Mitchell Susup, Francis Xavier Susup, Fransway Peol Susup, John Peol Susup and Sabattis Peol Susup, members of the Penobscot tribe of Indians, built a large house, some forty years or more ago, upon a lot of land occupied by them on Indian Oldtown Island.

Some ten years later, being also in possession of other real and personal property, they made a division of all their possessions. The said Peol Mitchell Susup and John Peol Susup took for their portion certain lots upon an island farther up · the river. Said Francis Xavier Susup took for his portion other property on the lower islands, leaving Fransway Peol Susup and Sabattis Peol Susup in exclusive occupancy of the large house and lot aforesaid. This division was presumably made by parol.

Being thus left with the house and lot aforesaid, said Fransway and Sabattis divided the premises (presumably by parol), Fransway taking the east half of the house and lot and Sabattis taking the west half of the house and lot, on which west half also stood a barn; and thenceforward they occupied their respective portions in severalty.

On the eighteenth of October, 1864, Francis Xavier Susup, by deed of quitclaim, duly executed and stamped, in the common form, conveyed to Fransway Peol Susup and Sabattis Peol Susup, their heirs and assigns, "all my right, title and interest in and to a certain house and barn and lot situated on Oldtown Island, being the same house and lot now occupied by said Fransway and Sabattis."

They had no title to these lands other than as members of said tribe, occupying the same under the laws relating to the Indian tribes, contained in chapter nine of the revised statutes. Nor does it appear that any certificate was ever issued to them, such as is prescribed in said chapter, but they were never molested or disturbed in their occupancy.

On December 12, 1871, Sabattis Peol Susup, being in declining health and having no children, made certain conveyances of his half of the aforesaid house and lot, to wit:

To his brother Fransway Peol Susup he conveyed, by quitclaim deed in common form, "that portion of my house above the second floor, *i. e.* rooms in the second story, and one-half the barn connected with said house."

Also on the same day he conveyed to his wife, Moddlin Susup, by like quitclaim deed, a life estate in "three rooms on the ground floor of my house, one-half of barn, and the lot on which said house and barn stand, on Oldtown Island,—the balance of the house and barn conveyed to his brother Fransway Susup."

Said Sabattis afterward (in 1872) died. His wife Moddlin continued to occupy the premises conveyed to her, and his brother Fransway the portion conveyed to him, in addition to the east half so long occupied by him as aforesaid.

On September 26, 1873, said Fransway made a quitclaim deed in common form to said Moddlin, her heirs and assigns, in which, for the consideration of six dollars, he conveyed to her "all my right, title and interest in and to one-half of the lot and barn thereon on Indian Oldtown Island, being the same property conveyed to me by Sabattis Peol Susup December 12, 1871."

Under this deed there was no change of possession in any property except the "half of barn." Said Fransway during his lifetime, and his heirs since his decease, continuing in the occupancy of the east half of the house and lot, and the rooms above the second floor of the west half.

Said Fransway died in April, 1875. Said Moddlin took down the barn and wrought the materials into a shed adjoining her rooms.

On December 6, 1875, said Moddlin, in writing on the back of the quitclaim deed dated December 12, 1871, from her husband to her, assigned to her brother Tomer Sabattis, the defendant, "all my interest in the within."

On the following day, December 7, 1875, she gave said defendant a warranty deed, which was duly executed and recorded in Penobscot registry of deeds, conveying, among other property, "a certain lot or parcel of land, situated in Oldtown, the half of the lot and the barn thereon, on Indian Oldtown Island, conveyed to me by Sabattis Peol Susup September 26, 1873, and

constituting the shed attached to my three rooms on the ground floor of my house—half the barn and lot aforesaid."

Said Moddlin afterward died leaving the defendant in the possession of the estate she had conveyed to him.

When Sabattis Peol Susup died he left only one brother surviving, Fransway Peol Susup, before mentioned; no children, no sisters, no father or mother. There were, however, children representatives of his deceased brothers as follows: Charles Fransway Susup and Mary Sockbasin Swassian, (plaintiffs) children of Francis Xavier Susup, Sabattis Susup John, Joseph Susup John and Peol Susup John, (plaintiffs) children of John Peol Susup who died in 1851.

On the death of Fransway Peol Susup, the only surviving brother, he left the following named children : Joseph Peol Francis Susup, Swassian Fransway Susup and Elizabeth Sabattis Tomer (plaintiffs).

All these children (8), nephews and nieces of said Sabattis Peol Susup, join in this action.

The conveyances before named were all approved by the then agent of the Penobscot Indians, except those from said Moddlin to the defendant, which were not approved by him.

None of these deeds were recorded in the Penobscot registry prior to the giving of the warranty deed by said Moddlin to the defendant.

Upon the foregoing facts the court is to enter such judgment as the rights of the parties demand.

*C. A. Bailey*, for the plaintiffs.

*Sewall & Blanchard*, for the defendant.

BARROWS, J. The wandering and improvident habits of the remnants of the Indian tribes within our borders led our legislature at an early period to make them, in a manner, the wards of the state, and especially to take the control and regulate the tenure of their lands. Numerous acts looking to this end were passed in different years, which are now gathered together in chapter 9, of the revised statutes. But the collection into one

chapter of statutes passed respecting different parcels of property or different tribes of Indians will not have the effect of carrying provisions relating to one such parcel or tribe into the statutes designed to affect others. These changes of collocation or even of phraseology in a revision of the statutes will not change the law unless the intent of the legislature to change it is apparent. *Hughes* v. *Farrar*, 45 Maine, 72.

Chapter 158 of the laws of 1835 was designed to promote an interest in agricultural pursuits among the Penobscot Indians. But it relates to lands other than those which are the subject of this suit. The assignment of the house and garden lots on Indian Oldtown Island (part of one of which is the subject of controversy in this suit) was regulated by chapter 396 of the laws of 1839, and the provisions of §§ 15–18 of chapter 9, R. S., have no connection with those of §§ 22 and 23 in the same chapter. They relate to different subjects, and are grouped together in chapter 9 only because they have reference to one of the Indian tribes; but the construction of §§ 22 and 23 does not in any manner depend upon §§ 15–18, any more than it does upon sections in the same chapter relating to Passamaquoddy Indians. The lots assigned under c. 158, laws of 1835, according to § 4 of that chapter, could not be sold by the Indians to whom they were assigned, to any person in or out of the tribe, with or without the permission of the agent, and we must give the same construction to § 18, c. 9, R. S., so far as the sale of lots there ordered to be assigned for agricultural purposes is concerned. " The permission of the agent" relates to the carrying off of the growth faster than is necessary for cultivation and to the leasing of the lots assigned for agricultural purposes, which might be done with the permission of the agent, by virtue of § 2, c. 331, laws of 1838. The reading of § 4 of the original act of 1835 demonstrates this beyond all possibility of mistake. The right to sell, even with the permission of the agent, has never been conferred expressly or by implication, and the broad prohibition of § 4, " It shall not be in the power of any Indian to sell his or her lot," is still the law touching the lots assigned for agricultural purposes.

But touching the house and garden lots assigned under c. 396, laws of 1839, and to which §§ 22 and 23 relate, while it is not requisite that a certificate should be issued in the form prescribed by § 17, provided the lot was originally assigned by the agent to the possessor or applicant, the only restriction upon the Indians' power of sale is that such sale shall be made only to some member of the tribe, and the purchaser as well as the seller shall hold it subject to the will of the legislature. The act of 1839 provides that "the lots so assigned by said agent shall be held and enjoyed by the person or family to whom they are allotted, during the pleasure of the legislature." This, in substance, gives to the person or persons to whom such lot is assigned a fee therein, determinable at the pleasure of the legislature. For legislative grants may convey lands without making use of technical words required in a deed. *Rutherford* v. *Green*, 2 Wheat. 196.

But, aside from the requirement of law that the determinable quality of the estate follows it in the hands of all to whom it may be transferred, the proprietor of such a qualified, base, or determinable fee, has the same rights and privileges over the estate as if he were tenant in fee simple. 4 Kent Com. (4 ed.), 10. Such a fee will descend in the regular line of succession like a fee simple. 1 Wash. R. E. (1 ed.), 64, c. 3, § 89. We see no reason why a family to whom one of these lots has been assigned may not make partition of it in the same manner and with the same effect as other tenants in common may.

While a parol partition of lands between co-tenants is invalid by reason of the statute of frauds, we think that there is no good reason why, if it is followed by twenty years continuous, adverse, exclusive possession by each of their respective shares in severalty, such possession will not operate as a bar to the claim of either upon the other for the share so occupied. See *Jackson* · v. *Harden*, 4 Johns. 202. *Jackson* v. *Vosburg*, 9 Johns. 270.

The case finds that, more than forty years ago, five brothers named Susup, of the Penobscot tribe of Indians, built a large house on a lot occupied by them on Oldtown Island. Ten years later, (or more than thirty years ago) being possessed of other real and personal estate, they made a parol division of all their possessions,

in pursuance of which Sabattis and Fransway were left in the exclusive possession of the house in question, and they thereupon divided the premises (so far as it appears, by parol), Sabattis taking the west half of the house and lot, on which stood a barn, and Fransway the east half, and thenceforward they occupied their respective portions in severalty for more than twenty years before the death of either. We think the result was that, independent of any conveyances, the heirs of Sabattis and Fransway respectively would have an estate in fee, determinable at the pleasure of the legislature, in that portion of the premises held by their ancestor in severalty. The brothers were in possession of the lot and had built the house before the passage of the law of 1839, and were by virtue thereof entitled to have it assigned to them by the agent, and the presumption is that he did his duty and assigned it to them. *Treat* v. *Orono*, 26 Maine, 217. A certificate, though a convenient muniment and evidence of title, is not essential to their title under the legislative grant of 1839.

Sabattis Susup at his death in 1872 left no child, father, mother, sister, or any brother but Fransway. His property descended to his brother Fransway, and to the children of his brothers Francis Xavier and John Peol Susup. The plaintiffs are the children of these brothers and the children of Fransway, who died in 1875. The defendant claims title under certain conveyances, the force and effect of which must be ascertained.

In December, 1871, shortly before his death, Sabattis Susup, then having, by virtue of the assignment and his exclusive occupancy in severalty of the west half of the lot on which stood the barn for more than twenty years after the division between himself and Fransway, a qualified fee in said west half which he might lawfully convey, made a quitclaim deed to his brother Fransway, the owner of the east half of the house and lot, of "that portion of my house above the second floor, *i. e.* rooms in the second story, and one-half the barn connected with said house."

Sabattis Susup, on the same day, conveyed to his wife Moddlin a life estate in "three rooms on the ground floor of my house, one-half of barn and the lot on which said house and barn stands on

Oldtown Island,—the balance of the house and barn conveyed to his brother," as above. After the death of Sabattis, his wife Moddlin continued to occupy the premises conveyed to her, and Fransway the portion conveyed to him, in addition to the east half which he had so long held, until September 26, 1873, when Fransway, in consideration of six dollars, by quitclaim deed in common form, conveyed to Moddlin " all my right, title and interest in and to one-half of the lot and barn thereon on Indian Oldtown Island, being the same property conveyed to me by Sabattis Peol Susup December 12, 1871." Under this deed there was no change of possession of any property except " the half of the barn." Fransway during his lifetime, and his heirs since his decease, have continued to occupy the east half of the house and lot and the rooms above the second floor of the west half, and their right to do so is not here in controversy. But, after the deed from Fransway to her, Moddlin took down the barn and wrought the materials into a shed adjoining her rooms.

In December, 1875, Moddlin, in writing on the back of her husband's deed to her, assigned to her brother, the defendant, " all my interest in the within," and the next day gave him a warranty deed, conveying, among other property, " a certain lot or parcel of land situated in Oldtown, the half of the lot and the barn thereon on Indian Oldtown Island, conveyed to me by Sabattis Peol Susup September 26, 1873, and constituting the shed attached to my three rooms on the ground floor of my house, half the barn and lot aforesaid."

This conveyance has not been approved by the Indian agent, but as the conveyance was made to a member of the tribe, this was not necessary, and the deed passed whatever interest in the premises therein described Moddlin had to convey.

Moddlin has since died, leaving the defendant in possession of the premises which are the subject of this suit, to wit: the three rooms on the ground floor of the west half, and the outbuildings connected with said half, and the lot of land on which said buildings stand and appurtenant thereto.

Whatever right the defendant had in the three rooms, or in any property conveyed to Moddlin by Sabattis Peol Susup, expired at

the death of Moddlin, for Sabattis gave her only a life estate. The reference in Moddlin's deed to the defendant to a conveyance from Sabattis September 26, 1873, is plainly a mistake, for Sabattis was then dead; that was the date of Fransway's quitclaim deed to her of his " right, title and interest in and to half of the lot and barn thereon, . . being the same property conveyed to (him) by Sabattis Peol Susup December 12, 1871."

The question here is whether Fransway conveyed to Moddlin any interest in the land on which the half of the barn stood, for we think the statement of the date of the deed makes it sufficiently certain that it was the deed of Fransway, and not that of Sabattis, which is referred to in Moddlin's deed to the defendant, and that the latter deed should be construed accordingly. Whatever it was that Fransway thus released to Moddlin, it was none other than " the same property conveyed to (him) by Sabattis Peol Susup December 12, 1871," and that, so far as the description of it relates to any property here in controversy, was " one-half the barn connected with said house."

The deed of Sabattis to Fransway dated December 12, 1871, conveyed no interest in real estate, except as incident to the structures standing thereon. No doubt that the land necessary for the support and use of the same may pass by the grant of a house or a barn or a mill, if such was the intention of the parties. But when the structure only is named, and no land is granted, *eo nomine*, but only as incident to the building, an abandonment of the site for the use of the structure will be followed by a failure of title to the site. *Miller* v. *Miller*, 15 Pick. 57.

If this be so, when Moddlin, after Fransway's conveyance to her, pulled down the barn and converted the materials into a shed adjoining her rooms, and abandoned the use of the lot on which the barn stood for the purpose of sustaining such a structure, the title to that part of the lot on which the half of the barn conveyed to Fransway stood, reverted to the heirs of the original grantor, Sabattis.

But it is not altogether clear that anything passed by Sabattis' deed to Fransway, except the right to use the structures named in the conveyance while they stood. No land is mentioned in connec-

tion with either of them, and Sabattis evidently did not intend that any right therein should pass; for by his conveyance to Moddlin, made the same day, he gave to her a life estate in the " lot on which said house and barn stands." " What shall pass by a conveyance, is purely a question of intention," remarks Shepley, J., in *Derby* v. *Jones*, 27 Maine, 357, where the question was whether buildings only, or the land on which they stood, also passed by a conveyance of " the house and stable on the mill lot at Great Works, built and now occupied by me."

It is true that the inquiry is as to the intention of both parties to the conveyance, and that the language of the deed, if ambiguous, is to be construed most strongly against the grantor. But there is plainly nothing in the deed of Sabattis to Fransway of December 12, 1871, which should be construed to carry anything more than the use of the real estate, so far as necessary for the occupancy and support of the structures which are conveyed.

We think that Sabattis Peol Susup made no conveyances which, according to the facts agreed, would prevent his property in the lot, so far as it is here in dispute, from reverting to his heirs, the plaintiffs, on the death of Moddlin, and that the defendant acquired by Moddlin's deed only an estate for her life, which was at an end before the plaintiffs brought this process against him.

Besides the question of his title as against that of the plaintiffs, which we have discussed, defendant objects that, even if they could maintain a writ of entry against him, he is not liable in this process, because he says that the provision of c. 94, § 1, giving this process against a disseizor, must have a reasonable construction, or it will operate to abrogate the remedy by writ of entry.

The construction must be such as accords with the plain import of the statute and gives effect to the remedy thereby provided. The arguments of counsel as to the effect of the provision in substituting this process for a writ of entry against a disseizor who has not been long enough in possession to be entitled to betterments, would be more properly addressed to the law making power than to us.

The suggestion that the entry is tolled by a descent cast, and that the same disability attaches to the rights of an heir in this

case as would attach if the defendant had disseized the ancestor so far as it is sound, does not apply. Sabattis was not disseized ; nor were the heirs disseized during the lifetime of Moddlin. The defendant was rightfully in possession under her deed until her death, and then only did the property revert to the plaintiffs as the heirs of Sabattis.

There was never any joint disseizin committed by Sabattis and Fransway, nor were they ever joint tenants with right of survivorship in any manner. Sabattis held the west half and Fransway the east in severalty for more than twenty years before the date of Sabattis' deed to Fransway. It is true, as suggested by defendant's counsel, that neither of them could acquire any rights as disseizors against the state. But as against their co-tenants and each other under the state grant, we see no reason why they should not. The defendant's estate in the premises is at an end. The plaintiffs are entitled to possession.

*Judgment for plaintiffs.*

APPLETON, C. J., WALTON, DANFORTH, PETERS and LIBBEY, JJ., concurred.